IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

**KEY TIDEWATER**   *
**VENTURES LLC,** *et al.,*

    **Plaintiffs**   *

    v.   *      **CIVIL NO. JKB-14-2170**

**PNC BANK, N.A.,**
     *
    **Defendant**
     *

* * * * * * * * * * * *

**MEMORANDUM**

Key Tidewater Ventures LLC, Tidewater Yacht Service Center, Inc., Tidewater Holdings LLC, Robert P. Brandon, and Jacqueline S. Brandon ("Plaintiffs") brought this suit against PNC Bank ("Defendant") for breach of contract and unjust enrichment under Maryland law. Now pending before the Court is Defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure (12)(b)(6), asserting that Plaintiffs failed to state a plausible claim for relief. (ECF No. 7.) The issues have been briefed (ECF Nos. 7, 9, 10), and no hearing is required, Local Rule 105.6. For the reasons explained below, Defendant's motion to dismiss is DENIED.

**I.**     **BACKGROUND**[1]

Plaintiffs obtained three loans from Mercantile Bank in June 2005.[2] (ECF No. 1 ¶ 10.) The first loan was for $5.5 million ("the Key Tidewater Loan") (*id.* ¶ 6), the second was for $500,000 ("the Original Equipment Line Loan") (*id.* ¶ 7), and the third was for $1 million ("the Original Equipment Loan") (*id.* ¶ 8). In November 2006, Plaintiffs' collective debt was

---

[1] The facts are recited here as alleged by the Plaintiff, this being a motion to dismiss. *See Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).
[2] PNC Bank became the successor by merger to Mercantile in March 2007. (ECF No. 1 ¶¶ 3, 13.)

1

consolidated into a single promissory note ("the Consolidated Note"), with Plaintiffs owing Mercantile Bank $7,050,000 over twenty years with a maturity date of October 31, 2025. (*Id.* ¶ 10; ECF No. 1-1.) The Consolidated Note included a prepayment fee that could be triggered if Plaintiffs chose to prepay this note before its maturity date (the "Prepayment Premium Provision")[3]—the conditions under which this premium could be triggered are now in dispute. (ECF No. 1 ¶ 11; ECF No. 1-1 at 4-5.)

In April 2011, Plaintiffs defaulted on the Consolidated Note, but Defendant did not accelerate loan repayment. Instead, the parties agreed to refinance the loan "[a]t PNC Bank's insistence," which culminated in "the Forbearance Agreement." (ECF No. 1 ¶¶ 15-16; ECF No. 1-2.) The Forbearance Agreement was reached in December 2012 to: (1) re-consolidate all loans; (2) set new maturity dates[4]; and (3) terminate the relationship between Plaintiffs and Defendant upon the loans' repayment. (ECF No. 1 ¶¶ 16-17.) The agreement does not explicitly reference the Prepayment Premium Provision or address its continued relevance. (*Id.* ¶ 18.) It does, however, contain two contested provisions: Section 6 preserves Plaintiffs' existing defaults and establishes Defendant's obligation to forbear from "exercising and enforcing any rights, remedies, or recourse" associated with those defaults, (ECF No. 1-2 at 8-9); Section 28 acknowledges that the Forbearance Agreement does not alter the Consolidated Note unless expressly stated, (*id.* at 18).

---

[3] "The Borrower may prepay this Note in whole or in part at any time; however, in the event that the Borrower elects to prepay this Note during the Initial Rate Period or during the first fifteen (15) years of the term following the Initial Rate Period, the Borrower shall pay a prepayment premium . . . . Such prepayment premium shall apply if the Borrower refinances the Loan with a lender other than [Defendant] (or its affiliates) or replaces [Defendant] as the lender institution. The above notwithstanding, the prepayment premium shall not apply . . . to the extent that a cash flow payment is made . . . except as a result of a default and acceleration hereunder, in which case the prepayment premium shall be due." (ECF No. 1-1 at 4-5.)

[4] The agreement set three distinct maturity dates for the three original loans. The Original Equipment Loan and the Original Equipment Line Loan were advanced to October 1, 2013 and May 1, 2013. (ECF No. 1-2 at 10.) The now-contested Key Tidewater Loan was advanced to June 30, 2014. (*Id.*)

At some point prior to the Fall of 2013, Plaintiffs repaid both the Original Equipment Loan and the Original Equipment Line Loan, seemingly without incident. (ECF No. 1 ¶ 20.) Plaintiffs then sought refinancing from a new bank in order to repay the Key Tidewater Loan by the advanced maturity date of June 30, 2014. Before making their final payment, Plaintiffs asked Defendant to identify all monies owed. Defendant's accounting included, together with uncontested debts, a Prepayment Premium totaling over $117,000, which was subsequently adjusted to $116,462.84. (*Id.* ¶¶ 20, 22.) Plaintiffs allege that a representative of Defendant apologized for the fee's inclusion, expressed his attempts to keep the fee off of Plaintiffs' final bill, and shared his belief that Plaintiffs could successfully challenge Defendant's application of the Prepayment Premium in court. *Id.*

Plaintiffs paid the Prepayment Premium under protest on February 21, 2014, along with a full repayment of all loans. (*Id.* ¶¶ 23-24.) Plaintiffs now bring claims to retroactively recover the contested Prepayment Premium.[5] Plaintiffs' complaint includes two alternative legal theories: (1) a breach of contract claim (*id.* ¶¶ 25-30); and (2) a claim for unjust enrichment (*id.* ¶¶ 31-32). Defendant filed its motion to dismiss on July 29, 2014. (ECF No. 7.) Plaintiffs filed their response to the motion on August 15. (ECF No. 9.) All relevant contracts confirm, and the parties do not contest, that Maryland law applies. (*See* ECF No. 1-1 at 9; ECF No. 1-2 at 14.)

---

[5] The parties have not produced any precedent addressing whether a plaintiff can seek relief in the form of a refund on payments made under protest. The Court has independently found analogous instances where other courts have appeared to accept *ex post facto* breach of contract claims to recover payments made under protest, though none directly addressed the question in the context of the common law of contracts. *See, e.g.*, *Seal & Co., Inc. v. A.S. McGaughan Co., Inc.*, 907 F.2d 450, 452 (4th Cir. 1990) (mentioning that the plaintiff performed "work under protest and then filed its breach of contract suit" before moving on to the merits of the claim); *Consolidated Waste Industries v. Standard Equipment Co.*, 26 A.2d 352 (Md. 2011) (assessing the merits of plaintiff's breach of contract claim where plaintiff had paid for defendant's performance under protest). Thus, the Court does not find any justification to encumber Plaintiffs' claims simply because they seek similar retroactive relief.

## II. LEGAL STANDARD

A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. An inference of a mere possibility of misconduct is not sufficient to support a plausible claim. *Id.* at 679. As the *Twombly* opinion stated, "Factual allegations must be enough to raise a right to relief above the speculative level." 550 U.S. at 555. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' . . . Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557). Although when considering a motion to dismiss a court must accept as true all factual allegations in the complaint, this principle does not apply to legal conclusions couched as factual allegations. *Twombly*, 550 U.S. at 555.

## III. ANALYSIS

### A. Count I: Breach of Contract

Under Maryland law, a plaintiff suing for breach of contract must show simply "that the defendant had a contractual obligation and that the obligation was breached." *Mathis v. Hargrove*, 888 A.2d 377, 396 (Md. Ct. Spec. App. 2005). The Fourth Circuit instructs that "the construction of ambiguous contract provisions is a factual determination that precludes dismissal on a motion for failure to state a claim." *Martin Marietta Corp. v. Int'l Telecomms. Satellite Org.*, 978 F.2d 140, 143 (4th Cir. 1992). A court must, however, make a threshold determination

about whether a contract provision is ambiguous before it denies a motion to dismiss. *See Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank, N.A.*, 929 A.2d 932, 952 (Md. 2007); *see also Calomiris v. Woods*, 727 A.2d 358, 362 (Md. 1999) (noting that "the question of whether a contract is ambiguous ordinarily is determined by the court as a question of law"). "A contract is ambiguous if, 'when read by a reasonably prudent person, it is susceptible of more than one meaning.'" *Diamond Point Plaza*, 929 A.2d at 951 (quoting *United Servs. v. Riley*, 898 A.2d 819, 833 (Md. 2006)). Courts may consider "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution" in making such a determination. *Calomiris*, 727 A.2d at 363 (quoting *Pac. Indem. v. Interstate Fire & Cas.*, 488 A.2d 486, 488 (Md. 1985)).

Maryland utilizes the objective interpretation principle in construing contracts. *John L. Mattingly Co., Inc. v. Hartford Underwriters Ins. Co.,* 999 A.2d 1066, 1074 (Md. 2010). If the contract's language is unambiguous, then courts give effect to its plain, ordinary, and usual meaning, taking into consideration the context in which the language is used. *Id.* "Where the contract comprises two or more documents, the documents are to be construed together, harmoniously, so that, to the extent possible, all of the provisions can be given effect." *Rourke v. Amchem Prods., Inc.*, 863 A.2d 926, 941 (Md. 2004).

Plaintiffs' complaint survives this motion to dismiss because the contested contracts—the Consolidated Note (ECF No. 1-1) and the Forbearance Agreement (ECF No.1-2)—do not clearly and unambiguously entitle Defendant to the Prepayment Premium. Key terms in the Prepayment Premium Provision are susceptible to multiple interpretations, and the Forbearance Agreement implies that it modified or perhaps even eliminated the Prepayment Provision. For these reasons, the Court finds the contracts to be ambiguous.

First, the Prepayment Provision on its own is susceptible to multiple interpretations. Section 5(a) of the Consolidated Note states that the premium is triggered "in the event that the Borrower *elects to prepay* this Note during" a specified time period before the original maturity date. (ECF No. 1-1 at 4 (emphasis added).) Neither the Consolidated Note nor the Forbearance Agreement define the terms *prepay* or *elects*.

On the definition of *prepay*, Defendant contends that prepayment would have occurred had the Note been paid any time before March 31, 2022.[6] (ECF No. 7-1 at 2-3.) While Defendant introduces one possible interpretation of the prepayment provision, the Court finds that alternative interpretations would also be reasonable. For example, a reasonably prudent person may understand the term *prepay* to mean "to pay before the maturity date." The maturity date was advanced by the Forbearance Agreement to June 30, 2014, and perhaps the Prepayment Premium was only meant to be triggered if the note had been paid prior to this new date. Of course, Plaintiffs still technically prepaid the note when they paid off the remaining loan approximately 100 days before the advanced maturity date. This raises additional ambiguities for the Court though, about how to interpret when the premium would be triggered. A strict interpretation might trigger the premium if the loan is paid any time before March 31, 2022—unless of course payment was made exactly on the advanced maturity date in which case payment would not have been *pre*paid. A reasonable alternative interpretation might trigger the premium only if the loan is paid more than five years before the maturity date—inferring that the

---

[6] The Consolidated note was originally to be paid over twenty years beginning in November 2006. The Prepayment Premium would be triggered if Plaintiffs elected to prepay either "during the Initial Rate Period or during the first fifteen (15) years of the term following the Initial Rate Period." (ECF No. 1-1 at 4-5.) The Initial Rate Period ended on March 31, 2007. Therefore, "prepayment" occurring under the Consolidated Note between November 2006 and March 31, 2007 (the Initial Rate Period) or between March 31, 2007 and March 31, 2022 (during the first fifteen years of the term following the Initial Rate Period) would be subject to penalty. (*See generally*, ECF No. 7-1 at 2-3.)

fifteen year prepayment term on a twenty year loan was intended to bar Plaintiffs from payment until the final five years of the loan's term.

The term *elect* is also unclear and ambiguous.  Plaintiffs were compelled to pay before the original maturity date, in accordance with the terms of the Forbearance Agreement that Defendant allegedly proposed.  Defendant was empowered to accelerate the loan for immediate payment upon Plaintiffs' default in 2011, but instead Defendant opted to amend the maturity date and advance payment to 2014.  Section 5(a) does trigger the Prepayment Premium "as a result of a default and acceleration," but default and acceleration did not take place here.  By the terms of the Consolidated Note, *acceleration* would have occurred if Defendant had made payment "immediately due and payable" upon default.  (ECF No. 1-1 at 5-6.)  Section 5(a) does not address whether an involuntary advance on the maturity date, at the behest of Defendant, would also trigger the Prepayment Premium.

Second, the terms of the Forbearance Agreement imply that it modified, if not fully eliminated, the Prepayment Premium Provision from the Consolidated Note.  If the Forbearance Agreement truly did not alter the Prepayment Premium Provision, Plaintiffs' adherence to the new terms would have necessarily triggered the premium.  That is to say, the advanced maturity date placed Plaintiffs in the precarious position where they were forced to repay their loans either too early—in relation to the original maturity date, and thus triggering the Prepayment Provision—or too late—in relation to the advanced maturity date, and thus breaching the Forbearance Agreement.  A reasonably prudent person could infer that the Forbearance Agreement was intended to alter the terms of Section 5(a) by adjusting the time period in which Plaintiffs would be liable for prepayment, such that Plaintiffs had the opportunity to comply with both the Prepayment Premium Provision and the Forbearance Agreement.

Sub-sections 5(b) and (g) of the Forbearance Agreement cast further doubt on any interpretation that would expose Plaintiffs to new liabilities in signing the Forbearance Agreement. Both sub-sections state that "the making and performance of this AGREEMENT will not immediately, or with the passage of time, the giving of notice, or both: (a) violate any laws or result in a default under any contract, agreement, or instrument to which any OBLIGOR is a party or by which any OBLIGOR or any property of any OBLIGOR is bound; . . ." (ECF No. 1-2 at 7-8.) These clauses may suggest to a reasonably prudent person that Plaintiffs signed the Forbearance Agreement with an expectation that compliance with the terms would not trigger new liabilities, penalties, or fees. The spirit of the Forbearance Agreement presented Plaintiffs with a conflict-free avenue to pay off their debt, which underscores that the Prepayment Provision's continued applicability is ambiguous.[7]

For these reasons, the contract is not so clear and unambiguous such that the Court can dismiss Plaintiffs' claims as a matter of law at this early stage of litigation. Rather, the Court anticipates that discovery and the introduction of extrinsic evidence may shed light on whether the Prepayment Provision was even considered during the drafting of the Forbearance Agreement, and if so what the parties intended regarding its continued application.

Upon a finding that a contract is ambiguous, a court may look to extrinsic evidence to "determine the intentions of the parties to the document." *Trouard v. Dickey's Barbecue Restaurants, Inc.*, 2014 WL 3845785, at *7 (D. Md. 2014) (quoting *Points Reach Condo. Council of Unit Owners v. Point Homeowners Ass'n, Inc.*, 73 A.3d 1145, 1163 (Md. Ct. Spec.

---

[7] The Court notes that, according to Defendant's interpretation of the contracts, the Prepayment Premium could have also been triggered when Plaintiffs repaid the other two loans prior to March 2022. The parties' briefs do not discuss the payment of the other two loans. That said, even if Defendant failed to seek a prepayment premium in other instances, the Court would not take this as a waiver of Defendant's right to do so in the instant action. Instead, the Court merely notes this apparent oversight in considering whether the terms of the contracts were truly clear and unambiguous.

App. 2013)). "The extrinsic evidence admitted must help interpret the ambiguous language and not be used to contradict other, unambiguous language in the contract." *Calomiris*, 727 A.2d at 366. Thus, Plaintiffs' claim for breach of contract survives this motion to dismiss.

### B. Count II: Unjust Enrichment

In Maryland, generally, a quasi-contract claim of "unjust enrichment cannot be asserted when an express contract defining the rights and remedies of the parties exists." *Cnty. Comm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600, 610 (Md. 2000). That general principle does not apply here, because no express contract provision unambiguously addresses what rights and remedies the parties have under the Prepayment Provision where the loans' maturity dates were advanced. Until the parties and the Court resolve whether Section 5(a) of the Consolidated Note applies to this dispute, Plaintiffs have adequately pled unjust enrichment as an alternative ground for relief.

### CONCLUSION

Accordingly, an order shall issue DENYING Defendant's motion to dismiss. (ECF No. 7.)

DATED this 15th day of October, 2014.

BY THE COURT:

/s/
James K. Bredar
United States District Judge